## ANDREW JERGENS CO. v. BONDED PRODUCTS CORPORATION.

(District Court, E. D. New York. May 26, 1926.)

1. **Trade-marks and trade-names and unfair competition** ☞89—**If complainant can stop one, for whom certain acts of unfair competition are done by defendant, from doing such acts, it can stop defendant from doing those acts.**

If complainant can stop one for whom defendant made and distributed soap from acts of unfair competition it can also stop defendant from doing such acts for him; while if such person had a right to do the things done, he could do them through others.

2. **Evidence** ☞256—**In suit to restrain unfair competition, defendant held not bound by statements made by its employees, in absence of proof that defendant was party thereto.**

In suit to restrain unfair competition, defendant *held* not bound by statements made by

its employees, in absence of proof that defendant was party thereto in some way.

**3. Action ⊚=65—Suit to restrain unfair competition should be decided on facts existing at time suit was commenced.**

Suit to restrain unfair competition in using same name and similar wrappers on soap to those used by plaintiff should be decided according to facts existing at time suit was commenced.

**4. Trade-marks and trade-names and unfair competition ⊚=75—Under prior decisions determining plaintiff's right to use surname "Woodbury" on soap, plaintiff's right to equitable relief held to depend on proof that an individual having such surname was using it to deceive "public."**

Where prior decisions of state and federal courts determined that contract giving plaintiff right to use surname "Woodbury" on soap did not give plaintiff exclusive right thereto, and that individual parties to agreement were not deprived of right to use their own name held, that plaintiff's right to equitable relief depended on whether any of said individuals was using such name to deceive public into thinking that his soap was plaintiff's soap, or a new brand thereof; "public" meaning that vast multitude, which includes the ignorant, unthinking, and credulous, who in making purchases do not stop to analyze, but are governed by appearance and general impression.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public.]

**5. Trade-marks and trade-names and unfair competition ⊚=23.**

A trade-mark functions only when connected with an existing business.

**6. Trade-marks and trade-names and unfair competition ⊚=31—Transferee of right to use individual's surname cannot, by expending large sums in advertising such name, enlarge its rights.**

Transferee of right to use individual's surname in manufacture and sale of soap, cannot, by expending large sums in advertising such name, enlarge its rights thereto.

**7. Trade-marks and trade-names and unfair competition ⊚=68.**

That soap manufactured by defendant under name and wrappers similar to plaintiff's sells for less than plaintiff's does not warrant interference by court.

**8. Trade-marks and trade-names and unfair competition ⊚=81.**

Court should be most cautious not to interfere without proper cause in business ventures between individuals, or with right of individual to use his own name.

**9. Trade-marks and trade-names and unfair competition ⊚=68—Second comers in the market should avoid confusion of their product with that of another.**

Second comers in the market, though entitled to all reasonable opportunity to expand their business, should avoid confusion of their product with that of another.

**10. Trade-marks and trade-names and unfair competition ⊚=17—There is no exclusive right in the mere color of wrappers, but the wrong exists in use of similar colors as an element in intentionally misleading public.**

There is no exclusive right in the mere color of wrappers, but the wrong, if any, exists when fraud on public is caused by use of similar colors as an element in the intentional and deliberate misleading of public to believe that both products are apparently from a well-known source.

**11. Trade-marks and trade-names and unfair competition ⊚=59(4)—Transferee of right to use name "Woodbury" in connection with toilet soap, acquired from beauty institute and individuals connected therewith, held entitled to enjoin defendants from using wrappers which would tend to confuse public, and to cease references to institute and to individuals connected therewith.**

Where plaintiff acquired right to use name "Woodbury" in connection with certain toilet soap from beauty institute and individuals connected therewith, held, that defendant's manufacture of soap for one of such individuals under name "Woodbury," having wrappers containing references to such institute and certain individuals connected therewith, which misled purchasers into believing that it was new brand of the original soap at much cheaper price, constituted unfair competition, entitling plaintiff to injunction requiring plain disclosure on every wrapper sufficient to reasonably avoid confusion, and to cease references to original manufacturer.

In Equity. Suit by the Andrew Jergens Company against the Bonded Products Comporation. Decree for plaintiff.

See, also, 9 F.(2d) 114.

Keyes Winter and John C. Pemberton, both of New York City (Walter A. De Camp, of Cincinnati, Ohio, and Edward S. Rogers, and Allen M. Reed, both of Chicago, Ill., of counsel), for plaintiff.

A. P. Bachman, of New York City, for defendant.

INCH, District Judge. This is a suit in equity. Plaintiff by bill and supplemental bill seeks to restrain defendant from unfairly competing with plaintiff by the alleged misuse of the name "Woodbury" upon toilet soap and the alleged imitation of the plaintiff's wrappers, etc. The defendant duly answered and the issues have been duly tried.

Plaintiff is an Ohio corporation, and is the successor to a partnership, Andrew Jergens & Co. (all of Cincinnati, Ohio). The defendant is a corporation organized and existing under the laws of the state of New York, with its office in Brooklyn, Eastern district. Both plaintiff and defendant are therefore citizens of different states, and the jurisdiction of this court is sufficiently established.

Both plaintiff and defendant are engaged in the manufacture of soap; the difference being that plaintiff manufactures and sells its own soap, while defendant in 1924 made an arrangement by which it has manufactured soap for one William A. Woodbury, who is not a party to this suit. Woodbury apparently supplied defendant with formulas and the labels, wrappers, etc. The defendant made the soap, and wrapped, boxed, and distributed it, on orders from said Woodbury.

[1] It seems to me, therefore, that in deciding the rights of the parties it is not improper to say that, if the plaintiff can stop Woodbury from doing certain things, it can also stop defendant from doing those things for Woodbury. Saxlehner v. Eisner, 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Nims, Unfair Competition (2d Ed.) p. 667. It likewise follows that, if Woodbury has the legal or equitable right to do certain things, he can do them himself or through others, so far as unfair competition is concerned.

I mention this for the reason that parts of the controversy indirectly presented here would appear to have been thoroughly litigated in other courts between various Woodburys and plaintiff. Such decisions (hereafter referred to) seem to have decided many of the important rights belonging to the parties before such courts, and will be followed by this court. However, so far as unfair competition by defendant is concerned, even though defendant insists that it is doing what it does upon orders by, or contract with, William A. Woodbury, such decisions do not seem to be adjudications of the particular issue now presented. The subject-matter of this suit is new, different, and a question of fact, and the present suit depends on its own facts.

Plaintiff is seeking to stop the defendant from "unfairly competing," or, as has lately been said, is seeking to enforce "the law of fair dealing." Nims, Illinois Law Review, vol. 20, No. 5, p. 532. It does not seem necessary for me to cite the very great number of cases on this subject, each largely depending on its own facts.

"These cases obviously apply only where the defendant adds to his own name imitation of the plaintiff's labels, boxes, or packages, and thereby induces the public to believe that his goods are those of the plaintiff. A man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property. If such use be a reasonable, honest, and fair exercise of such right, he is no more liable for the incidental damage he may do a rival in trade than he would be for an injury to his neighbor's property by the smoke issuing from his chimney, or for the fall of his neighbor's house by reason of necessary excavations upon his own lands. These and similar instances are cases of damnum absque injuria." Howe Scale Co. v. Wyckoff, Seamans, etc., 198 U. S. 118, 134, 135, 25 S. Ct. 609, 612 (49 L. Ed. 972).

It is also apparent that, in the growth of this branch of the law, a search is being made for some term comprehending more than mere "competition." Oftentimes the real wrong is a "misappropriation" by one party of the property of another, a "taking," unfairly and without compensation, of another's property, such as exists in cases of advertising. Hilson v. Foster (C. C.) 80 F. 896, 897.

[2] I have received the depositions offered by plaintiff. An exception is given to defendant. In considering them I have not overlooked, but, on the contrary, have very carefully considered, the numerous objections to portions of each deposition. Some of these objections are undoubtedly well taken, but it would seem neither necessary nor possible to set forth in this opinion each objection and ruling. Suffice it to say that, while I do not consider the defendant in any way bound by statements alleged to have been made by shop workers and others, in the absence of proof that defendant was a party in some way to same, and therefore have not considered such testimony in coming to my conclusions, yet I have taken the depositions, and such parts as I have deemed plainly competent, for what they are worth, and from same I find sufficient to satisfy me that a real, important, and widespread confusion, between the goods of plaintiff and that put out by defendant, exists, not only in local markets, but throughout this country.

[3] Defendant indicates that no relief should be granted plaintiff for the reason that, after the suit was commenced, the defendant stopped all work complained of. It seems to me that I should decide according to the facts existing at the time suit was commenced. Vick Co. v. Vick Co. (C. C. A.) 11 F.(2d) 33, 35. The following facts should be stated:

The plaintiff corporation is the successor of a partnership of a similar name, which for over a quarter of a century has been making soap. Prior to 1901 it manufactured soap for one John H. Woodbury, who was then the head and brains of the Woodbury Dermatological Institute, in which the said John H. Woodbury, a cousin, William A. Woodbury, and one P. M. McCargo were interested. The said William A. Woodbury's duties "seem to have been those of a general manager, with

more or less supervision over all the departments of the Institute, but in charge particularly of its advertising." Andrew Jergens Co. v. Woodbury, Inc., infra.

On June 13, 1901, a written agreement was entered into between said partnership (to which plaintiff succeeded) and the said Woodburys, McCargo, and Woodbury Institute, by which the Jergens Company, for the sum of some $200,000, etc., purchased eight different commodities, among which was a well-known "facial" soap, and the vendors "duly assigned, transferred, and delivered to the vendee all and each of their right, title, and interest in and to the aforesaid soap, etc., together with all trade-marks, copyrights and *privileges of every name and nature whatsoever appurtenant to the ownership thereof.*"

As I have said, the Jergens Company, prior to this purchase, had been making this soap for the Woodburys. The agreement simply meant that they now owned for themselves that which had previously been manufactured by them (at least, so far as soaps go). The Woodburys apparently had spent considerable money and skill in advertising this "facial" soap. It had a trade-mark connected with its sale, consisting of a neckless head of John H. Woodbury and the name "John H. Woodbury's" above his head in large type.

This soap became very popular, especially in connection with the so-called "beauty business." In fact, so far as I can see, this was about all there was to the Dermatological Institute, and the considerable sum at that time paid by Jergens Company would indicate that, in those days of a dollar with larger purchasing power, it was considered by all parties extremely valuable. There were other soaps and preparations still retained by the vendors. Whether or not they were really worth anything does not seem to me to be so apparent. See Defendant's Exhibits U and V and testimony of Peyton R. McCargo, S. M. 92.

The effect of this purchase agreement of 1901 has already been, to some extent, considered by the decisions in the said litigations between plaintiff and the Woodburys. After 1901, the Jergens Company, first as a partnership and later as a corporation, entered into a very extensive advertising campaign, running into enormous sums of money, as a result of which the previous good impression and somewhat wide reputation of this Woodbury's "facial" soap (in my opinion, the principal soap of said vendor) was tremendously increased and extended, and, as is natural, the consumers, whether individual or merchant, soon fell into the easy way of referring to this soap as the "Woodbury soap." It was but a short step from this to the considering by the public of "any" soap called "Woodbury" to be from the same source. In other words, it has already been found that the surname "Woodbury" had acquired a "secondary" meaning. Jergens v. Woodbury, Inc., infra.

In 1905 the Institute entered into an agreement with a New York corporation, by name the Woodbury Company, which contract has been construed as conveying all rights to use the trade-name "Woodbury," that the said "Dermatological Institute" had theretofore enjoyed, save only "such limited rights" as were granted by it by the said agreement of 1901 between the Jergens Company and the Woodburys et al. Jergens Co. v. Woodbury, Inc., infra. In 1908 the Institute went into bankruptcy, and the Jergens Company obtained an assignment from a trustee in bankruptcy, through a third person, of all the right, title, and interest of the "Woodbury Dermatological Institute," bankrupt, in the "trade-mark," together with an "exclusive" right to manufacture and sell a number of other proprietary toilet articles. The effect of this assignment has also been considered. Jergens Company v. Woodbury, Inc., infra.

We have, therefore, in 1909, the Jergens Company carrying on this extensive advertising and business of selling Woodbury's "facial soap" etc., with the Woodbury Dermatological Institute completely denuded of all assets, by the 1901 agreement, plus the 1905 agreement, and, if anything had been left, by the 1909 agreement. From that time on there has been no such thing as the Woodbury Dermatological Institute. Also John H. Woodbury died in 1909.

These facts are significant, for the general public have not gone into these details, and their continued belief that the one source is the original Woodbury and his Woodbury's Institute appears to me to be a fact from the record here. We now come to the first of what I deem to be a series of efforts of others to enjoy the advertising paid for by plaintiff.

Several years before John H. Woodbury died, and after he with the others had duly entered into the agreement with the Jergens Company on June 13, 1901, he and a concern called "Woodbury-McGrath Company" started to sell to the public what was termed "Woodbury's New Skin Soap." This sort of unfair competition with the Jergens Company, which, as we have seen, had previously paid a great deal of good money to this Woodbury and his associates for his Woodbury's "facial" soap, and had been promised that it could enjoy the "privileges of every

name and nature whatsoever appurtenant to the ownership thereof," compelled the Jergens Company to seek an injunction. This was done in the courts of the state of New York. Jergens Co. v. Woodbury et al., 197 N. Y. 66, 90 N. E. 344, reargument denied 197 N. Y. 581, 91 N. E. 1109.

The Jergens Company succeeded in the lower court in obtaining an injunction restraining John H. Woodbury and his associates from manufacturing or selling *any* soap, under the name "Woodbury," or under any name which contains "Woodbury," or any soap so manufactured, wrapped, or sold as to lead or be calculated or designed to mislead the public or the trade to believe that the same is "Woodbury's soap," or "Woodbury's facial soap," or the soap manufactured by plaintiff (Jergens Company) under the name "Woodbury," or a new or improved brand thereof.

The Appellate Division of the Supreme Court unanimously affirmed this decision. The Court of Appeals modified this judgment, stating: "It follows that the injunction embodied in the judgment is right, so far as it is effectual to restrain the defendants from using the name 'Woodbury' in connection with any of the articles specified in the contract and *also* so far as it restrains them from making and selling 'Woodbury's New Skin Soap.' It goes too far, however, in forbidding the defendants from using the name 'Woodbury' on other soaps or in connection with other articles, *where such use is not deceptive or misleading.* The judgment should be modified by striking therefrom the restraining paragraph, and substituting therefor the following: 'Adjudged and decreed that the defendants John H. Woodbury and the Woodbury-McGrath Company, and their respective agents, servants, attorneys, officers, and employees, and all persons claiming under them or either of them since June 13, 1901, be perpetually restrained and enjoined from selling or offering for sale the soap known as Woodbury's New Skin Soap, or any other soap under such a name or designation, or put up or prepared in such a manner *as to be calculated to lead the public or trade to believe that in purchasing said soap they are purchasing Woodbury's Facial Soap or a new brand thereof.'*" Jergens Co. v. Woodbury, 197 N. Y. 67, 68, 90 N. E. 344. (Italics mine.)

It would seem, therefore, that the Court of Appeals plainly decided that John H. Woodbury could continue to use his name in spite of the 1901 agreement. If John H. Woodbury could do so, I see no reason to dis-

tinguish William A. Woodbury, who also was a party to that agreement. (It is defendant's claim that it is only manufacturing, etc., these soaps now complained of by plaintiff as to wrappers, etc., for William A. Woodbury.)

Therefore, while it has been substantially decided that any party vendor to the 1901 agreement can continue to use his individual name in connection with soap, yet it has been made clear that plaintiff is not to be confined within the rigid and narrow limitations of the word "facial" when applied to soap, but that, on the contrary, if the facts of the particular case indicate that the public is being confused and misled and deceived into believing something to be true that is false by the advertising or merchandise of a "Woodbury," then such "unfair competition" or "unfair dealing" or "misappropriation" will not be allowed to continue simply because a different word than "facial" had been used to designate the soap. In other words, if the public or trade had been led to believe, by reason of the manner in which it is put up or prepared for the market, that in purchasing same that they are purchasing Woodbury's "Facial" Soap *or a new brand thereof,* then such acts on the part of a defendant, even though he be a "Woodbury," will be restrained.

So much, then, for the above decision and its effect on the issues now presented before me. We now come to the second decision, which is Andrew Jergens Co. v. Woodbury, Inc. (D. C.) 273 F. 952, affirmed (C. C. A.) 279 F. 1016, certiorari denied 260 U. S. 728, 43 S. Ct. 92, 67 L. Ed. 484.

This decision represents the determination of a suit brought by plaintiff against William A. Woodbury Distributors, Inc., Woodbury, Inc., and Woodbury System, Inc. It indicates that, after the death of John H. Woodbury and the said decision in the state Court of Appeals, the Jergens Company encountered new competition in the sale of its "facial soap" by reason of a confusion by the public as to soaps made by William A. Woodbury. It accordingly sought an injunction. Among other things the court found as follows:

"It cannot be denied that the evidence discloses that some confusion exists in the public mind as to the origin of the articles of the respective parties, yet, so far as I have been able to discover from the evidence, such confusion as does exist arises from the exercise of the legal rights of the respective parties, and not from any wrongful act of the Distributors. Such confusion seems wholly attributable to the fact that two separate and distinct corporations, deriving their title from

a common source, have the right to use the same mark and name upon different articles and preparations of the same general class, and to the further fact that an individual has, subject to certain conditions (observed, I think, by the Distributors), the right to use his name in his business, although his surname may have acquired a secondary meaning, and to transfer that business to a corporation bearing his name. Howe Scales Co. v. Wyckoff, Seamans, etc., 198 U. S. 118, 25 S. Ct. 609, 49 L. Ed. 972; Waterman Co. v. Modern Pen Co., 235 U. S. 88, 35 S. Ct. 91, 59 L. Ed. 142.

" * * * While I have given this limited detailed consideration to the question of infringement of complainant's rights by the Distributors, *I do not understand the complainant to contend that the defendants or any of them have violated or threatened to violate any rights which the Jergens Company claims under the 1901 contract; its charges of infringement having been predicated mainly, if not entirely, upon the hypothesis that it has the sole and exclusive right to use the neckless head trade-mark and the name 'Woodbury' upon toilet articles and dermatological preparations.*" Andrew Jergens Co. v. Woodbury, Inc. (D. C.) 273 F. 952, 966. (Italics mine.)

This decision was affirmed by the Circuit Court of Appeals.

[4] Accordingly it has been clearly decided by two previous courts, in litigations between the Jergens Company and the other parties to the said 1901 agreement, that plaintiff has not the exclusive rights to the word "Woodbury"; that William A. Woodbury (and during his lifetime John H. Woodbury) could and can use their own names in the manufacture of soap; that, even though the name "Woodbury" has received a "secondary meaning" in the minds of the public, there is no exclusive right thereto in the Jergens Company. It would seem to have been left open, upon proof of facts belonging to each case, for a court of equity to ascertain whether or not a "Woodbury," by himself or through another, and in spite of all the above rights to use the name, is deceiving "the public" into thinking that his soap is plaintiff's "facial" soap *or a new brand thereof.*

By "the public" we mean "that vast multitude which includes the ignorant, the unthinking, and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions." Florence Mfg. Co. v. Dowd, 178 F. 73, 101 C. C. A. 565. The issue thus left, after considering the above rights, agreement, etc., as construed by previous and controlling decisions, becomes narrow and dependent largely on the facts. Let us now consider this issue.

Plaintiff complains, among other things, of the use by defendant, in wrapping soap for William A. Woodbury, of the wrappers "Woodbury's Calamined Soap," "Woodbury's Skin Soap" (bill of complaint), and "Skin Soap, William A. Woodbury, Ideal." I have decided to limit my consideration to these soaps concededly made and wrapped by defendant. There is some confusion about others. Therefore I am deciding as to "Calamined Soap" (1924), the "Skin Soap, with black wrapper," and the "Skin Soap, with the blue wrapper" (1925).

[5] The plaintiff, in view of the decisions, cannot yet hope to have an adjudication that to it alone belongs the word "Woodbury." Eventually there may be no "Woodbury" left to take the field of soap manufacture and assert a right to the name, and such right, because of the nonexistence of a rival business, may become exclusive. The trade-mark functions only when connected with an existing business. Hanover Milling Co. v. Metcalf, 240 U. S. 423, 36 S. Ct. 357, 60 L. Ed. 713; United Drug Co. v. Rectanus, 248 U. S. 90, 39 S. Ct. 48, 63 L. Ed. 141. But I should imagine from the experience shown in the past 25 years that this situation is far distant.

[6] Nor does it seem to me possible for plaintiff, by force of expenditure of great sums of money, in an effort to emphasize the single word "Woodbury," as some of the exhibits indicate, to enlarge its rights in this name beyond that allowed by the courts. Far better, it would seem to me to be, for plaintiff to commence to inform the public that the original and famous Woodbury's "Facial" Soap was manufactured by it for Woodbury, and that the Jergens-Woodbury soap is the soap they want.

[7] Simply because the "Calamined" soap of William A. Woodbury is a 10-cent cake, while plaintiff's soap costs more, affords no reason to interfere. "The mere fact that one knows that cheap goods sold by him to the trade, stamped with his name, can and will be sold by dishonest dealers under representations that they are manufactured by a company of established reputation having a similar name, which manufactures a high class of goods, does not justify an injunction against the use of such stamp." Rogers v. William Rogers Co., 70 F. 1019, 17 C. C. A. 575.

[8] The court should be most cautious not to interfere, without proper cause, in business ventures between individuals, and the right

of a man to use his own name has rarely been prohibited. As has been said, "judicial paternalism should be avoided; there should be no officious meddling by the court with the petty details of trade; but, on the other hand, its process should be promptly used to prevent an honest business from being destroyed or invaded by dishonest means." Hilson Co. v. Foster (C. C.) 80 F. 896.

The facts in the case of Westphal v. Westphal, 216 App. Div. 53, 215 N. Y. S. 4, are very different from the facts here. There the court says: "The evidence shows and is uncontradicted that the president of the defendant, young Paul Westphal, has threatened to destroy the plaintiff and to drive it into bankruptcy by appropriating the name 'Westphal's.'" And even in that case two of the justices dissented, on the ground: "The injunction is too broad. It absolutely restrains the use by defendant Westphal of his own name." Finally, while that case should be considered with the utmost care, due to the high authority from which it comes, it is not the same as a final decision by the Court of Appeals of the state.

I think I may reasonably infer that the courts of the state had before them the 1901 agreement in the suit of Jergens Co. v. John H. Woodbury, supra. It is plainly shown that such agreement was before the federal courts in the case of Jergens Co. v. William A. Woodbury et al., supra. In the state courts we have an injunction allowed by the highest court, preventing, on the facts found, the sale by John H. Woodbury, because of its wrappers, etc., of a "New Skin Soap." In the federal courts we have the statement, above quoted, to the effect that nothing therein decided was to be considered as affecting a proved violation of the agreement of 1901.

Bearing the above in mind, I have examined the wrappers complained of, and the method pursued by defendant, for William A. Woodbury, in merchandising the "Calamined" and "Skin" and "Ideal" soap, and am satisfied, on the facts proved, that, to the extent to be indicated in this opinion, defendant has been unfairly dealing, unfairly competing, and unfairly appropriating. In doing this, I assume that William A. Woodbury has a right to use his own name in making soap, I also assume that plaintiff has no exclusive right to the name "Woodbury" in connection with a cake of soap. I am equally well satisfied that the proofs sufficiently show, aside from all incompetent testimony, that the general public has been greatly confused between soap made by defendant for William A.

Woodbury and that made by plaintiff, in the form of John H. Woodbury's "Facial" Soap; that such confusion has been intentionally caused by William A. Woodbury and carried out by defendant.

[9] So far as I can see, the Woodbury's "Facial" Soap was the first to become, and remains so to-day, the most prominent "Woodbury" soap on the market. The plaintiff has been associated with its manufacture and sale for over a quarter of a century. In this sense, plaintiff's soap has been the first on the market. Second comers in the market, while they should be allowed all reasonable opportunity to expand their business, nevertheless should and could avoid, and in fact under ordinary circumstances should be anxious to avoid, confusion of their product with that of another. It is not the province of this court to designate the kind of change or character of that type that would accomplish this result, although this occasionally has been done. Donnell v. Herring, 208 U. S. 267, 274, 28 S. Ct. 288, 52 L. Ed. 481; Baker v. Sanders, 80 F. 889, 895, 26 C. C. A. 220; Waterman Co. v. Modern Co., 235 U. S. 88, 35 S. Ct. 91, 59 L. Ed. 142. I fear, however, that any such allowed use here of such distinctions, unless very carefully used, would probably result in the same subtle deceit now apparent in defendant's wrappers, etc.

Sincerity and not subterfuge is required. "Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied with any precaution or indication, in itself amounts to an artifice calculated to produce the deception alluded to in the foregoing adjudications." Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 188, 16 S. Ct. 1002, 1009, 41 L. Ed. 118. "The fair and honest use of a person's own name in his ordinary and legitimate business, although to the detriment to another, will not be interfered with. A tricky, dishonest, and fraudulent use of a man's own name, for the purpose of deceiving the public, and of decoying it to a purchase of goods under a mistake or misapprehension of facts, will be prevented." Rogers v. Rogers, 70 F. 1017, 17 C. C. A. 576. Opinions of Shipman and Wallace.

Thus it would seem to be required that the defendant must wrap and vend its soap, so as to make it plain *even to the ignorant and unwary person* that its soap is its own, and not that of plaintiff's. A defendant must be sincere, and not "slick," however much the inducement. He should not deliberately con-

fuse, in the minds of the public, the source of his wares. As has been said: "As is usual in such cases, the alleged infringer insists that he had no intention to dress up his goods to resemble complainant's; that, on the contrary, the very identity of the surnames, Baker, 'made him all the more careful to avoid any confusion therefrom.' * * * His success in accentuating differences has certainly not been remarkable, and it is curious to note how frequently in cases of this kind the designer's efforts to produce wrappers, labels, and inscriptions which shall be distinctly characteristic of some new make of goods result only in producing confusion with some earlier and well-known brand." Walter Baker v. Sanders, 80 F. 889, 892, 26 C. C. A. 220, 223.

Bearing in mind the agreement of 1901 between William A. Woodbury and others and the Jergens Company, and particularly the clause by which the former sold to the latter "privileges of every name and nature whatsoever appurtenant to the ownership" of the famous Woodbury "Facial" Soap, the decision in the case of the original John H. Woodbury that he could not unfairly compete with the Jergens Company in selling a "New Skin Soap" or *what the public might confuse with "a new brand of facial soap,"* and the fact that the proof in this case plainly shows the first and best known "Woodbury soap" in the market was the soap put out by the "Institute," and that the public has become so used to considering this soap as not to distinguish it from other soaps, and that by the very long continued association of the Jergens Company with the manufacture and sale of this particular soap, and its immense advertising of that fact, together with the fact that over 16 years ago the Institute disappeared entirely in bankruptcy and no longer exists (a fact to which the general public probably never gives a thought, so that the identity of source of the Jergens soap is still found to be in that direction), it would seem to me that the "privilege," if any there be, of having no confusion in this regard, produced in the minds of the public, was a "privilege" distinctly granted to the Jergens Company by the agreement of 1901, when it was made with the Jergens Company by this same William A. Woodbury among others.

I am convinced that defendant as well as its principal or joint tort-feasor are well aware of this situation. I am not aware that any of these soaps, such as "Calamined," "New Skin," or "New Skin Ideal," were ever made or sold by the "Institute." They apparently are the new product of William A.

Woodbury. Certainly, so far as I can see, the designs of the wrapper are new.

[10] There is no exclusive right in the mere color of wrappers. The wrong, if any, exists when a fraud on the public is caused by the use of similar colors, as an element, in the real deceit forbidden, to wit, the intentions and deliberate confusion, misleading the public to believe that both products are apparently from a same well known source. It is the "ordinary purchaser" that is to be protected from this confusion. Von Mumm v. Frash (C. C.) 56 F. 830. It has been well said: "It is so easy for the honest business man, who wishes to sell his goods upon their merits," to avoid this confusion. Florence Co. v. Dowd, 178 F. 73, 101 C. C. A. 565.

Moreover, while a man may have the right to use his own name, this might seem to be his whole name, not necessarily but a portion thereof, particularly where, by emphasizing that portion, the facts show that a confusion has been deliberately caused. However, I shall consider this determined in defendant's favor by the previous decision in the federal courts. There has been no decision presented to me that this defendant or William A. Woodbury has the right to use "collateral information," however true in fact it may be, except where allowed by contract or "fair dealing," where the use thereof in connection with the man's name creates a confusion causing damage which should and can be avoided. Furthermore, if, in all fairness and equity, the "privilege," if any there be, to use such "collateral information," would seem to have been expressly agreed upon, in writing, to belong to one party to the agreement, the other party should not proceed to use such information, in order to confuse the public, and injure the first party's right to sell its products, which it has honestly and fairly obtained.

In cases where the imitation and confusion are *deliberately caused by crude and bold* methods, no difficulty is experienced by the courts, nor in cases where the product is one that is fraudulently advertised as the product of another. Where, however, there are present certain legal rights, such as the right to use one's name, etc., a plausible argument can always be made by the infringer. Yet in just such cases, where the intentional imitation and unfair competition is subtle, even more damage may be caused because of the inability of the vendor to reach the intelligence of the many wholesale, retail, and individual purchasers, who indeed might be ready themselves, without a warning, to reject the more plain and open fraud. "The public do not go

into the minuter refinements of the title or the label." Walter Baker v. Sanders Co., 80 F. 889, 26 C. C. A. 220.

We have here, it seems to me, a case of this subtle advertising. While most of the relief really desired by plaintiff has been decided adversely to it, by the decisions in the state court (Jergens v. John H. Woodbury et al., supra) and in the federal court (Jergens v. Woodbury, Inc., supra), there still remains, not only because of the agreement of 1901, but because of the facts of this case, an "unfair dealing," or "competition," or "misappropriation" by defendant by and for the said William A. Woodbury, and shown in the wrappers complained of in the bill of complaint and supplemental bill of complaint.

[11] Aside from the general appearances, and the emphasizing of one part of the name without any attempt to plainly show that its producer has no connection whatever with the manufacturers and sellers of the famous John H. Woodbury's "Facial Soap," we find the following references in each to the equally famous "John H. Woodbury" and "Woodbury Institute," both of which long ago ceased to exist. The former has been plainly identified by plaintiff, by the expenditure of a great amount of plaintiff's money, through a period of some 25 years, with plaintiff's soap. The latter to a less extent has been so identified. William A. Woodbury must know this. It seems to me such references are not unintentional or inadvertent. They have been found to have value, and to have occasioned a profit, by creating a confusion as to the source of the soap made by defendant and that made by plaintiff.

As I have said, I do not believe that it has been decided by any court that a right to set forth this "information" on the part of defendant or William A. Woodbury exists, and where, as I believe it does, it is used to create a "confusion" in the minds of the public, it constitutes an "unfair act" in the sale of soap, which a court of equity can stop. I suppose anybody can call himself a "famous author" or "dermatologist," although a greater portion of the time he had been engaged in advertising. It is likewise natural, perhaps, to hold in high regard, and keep same before the public, a cousin who had become famous as a soap seller; but, if the result is that "the public" confuses the "cousins" and confuses the "dermatologists," there would seem to be a necessity for a plain statement of "who is who," so that there need be no confusion whatever in a purchaser's mind, as to the source of soap now offered to him.

We find, in each of the wrappers complained of, a reference as follows:

| Wm. A. Woodbury was Managing Director & President of the famous Dermatological Institute during the years of its greatest growth and reputation. |

| Wm. A. Woodbury<br><br>Wm. A. Woodbury is recognized as the greatest living authority on Beauty Culture being the author of its popular textbooks, and having managed for years the famous Dermatological Institute founded by the late John H. Woodbury.<br><br>Therefore his name on any toilet article means; high quality ingredients, compounded by expert chemists according to modern formulae, perfected by years of experience catering to a critical public. |

Exhibit B, Woodbury's Calamined Soap.

| Wm. A. Woodbury was for years Managing Director and President of the celebrated Dermatological Institute founded by the late John H. Woodbury. |

| Based on two generations of experience, this Soap is offered as the Standard Detergent for cleaning the skin and clearing the complexion. |

Skin Soap, Woodbury Exhibit B s.

"Wm. A. Woodbury was for years Director and President of the celebrated Dermatological Institute founded by John H. Woodbury."

"Based on two generations of experience, this Soap is offered as the Standard Detergent for cleaning dry, fine, delicate skin, and clearing and beautifying the complexion."

Skin Soap Ideal, Exhibit B 6.

For what purpose, therefore, and by what right, in fair dealing, does this William A. Woodbury, by defendant, constantly and in various forms reiterate to the trade the name of his famous cousin "John H. Woodbury"; that his soap is perfected by years of experience, in connection with his management of the equally famous "Woodbury Institute."

William A. Woodbury's soap may be in itself a fine article; it may be every bit as good, in every way, as any other soap on the market; but why this widely advertised clinging to the reputation made by the "original Woodbury," with the subtle use of names and source, innocent in themselves, if carefully read, but entirely misleading to an ordinary purchaser, unaware of the subtlety which is misleading him?

Of course, the purpose is to confuse the trade and make a purchaser believe that "William A. Woodbury" and "John H. Woodbury" are for all useful purposes the same

source (although one made the soap and the other advertised it); that the cake of soap now offered is not only from the same source as that of plaintiff, but that it has the same excellent qualities and standard, which the purchaser has been taught for 25 years is associated with the original "John H. Woodbury's Facial Soap" and Woodbury's Institute, with the additional inducement that this "new brand" is a great deal cheaper. The latter, while not in itself sufficient, may not be overlooked, where "unfair" means are being used in a sale. The purpose has succeeded.

Therefore, while I cannot see my way clear, in view of previous decisions, to grant the broad injunction asked for in section (1) of paragraph (b) of this complaint, it does seem to me that I am justified, on the facts here, in granting an injunction as asked for in section (2) of paragraph (b), to the extent of requiring a plain, express disclosure on each wrapper, sufficient to reasonably avoid the confusion that now exists, and that the defendant cease from this subtle advertising of its soaps by reference to either "John H. Woodbury" or the Woodbury Dermatological Institute, both of whom were parties to the 1901 agreement, as well as William A. Woodbury, whose orders, etc., defendant claims it is simply carrying out. The "privilege" to use this information is in plaintiff, if in anybody.

As I have said, William A. Woodbury and his associates are not before me; the defendant is, and therefore it alone can be forbidden. This does not mean that William A. Woodbury and his associates, or defendant, need stop making soap, but it does mean that reasonable and sincere ways must be devised, in accordance with this opinion, and as plainly as possible, so that no person, however unwary or careless, need longer be confused as to the respective soaps, or that in buying a William A. Woodbury soap he is buying the original John H. Woodbury's "Facial Soap," originally put out by John H. Woodbury's Dermatological Institute, or *some new brand thereof*.

Decree for plaintiff in accordance with this opinion.